FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

JUN 04 2014

D. MARK JONES, CLERK
BY _____
DEPUTY CLERK

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>ISAAC AVALOS,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER<br><br><br><br>Case No. 2:13CR692<br>Judge Dee Benson |

This matter is before the court on Defendant Isaac Avalos's motion to suppress evidence related to a domestic disturbance in West Valley City, Utah, on September 2, 2013. The court held an evidentiary hearing on February 28, 2013. At the hearing, Defendant was present and represented by Adam G. Bridge, and Plaintiff was represented by Drew Yeates. The government called Officers Quinn Gatrell and Stuart Palmer to testify, and Defendant called Lorena Herrera. Following the hearing, the court set a briefing schedule. Thereafter, at defendant's request, the court heard oral argument on the matter. After review and consideration of the memoranda submitted by the parties, the testimony presented at the evidentiary hearing, and the oral arguments later presented by counsel, the court enters the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

Officer Quinn Gatrell is a police officer with the West Valley City Police Department. At 9:10 am on September 2, 2013, Gatrell responded to a domestic violence call in West Valley City at approximately 4500 West and 4000 South. The caller, Mary Rueda, reported that her

1

daughter, Lorena Herrera, was involved in a verbal and physical altercation with her boyfriend, Defendant Avalos, who had a history of carrying a gun. The mother also told dispatch that she was upstairs waiting with the children.

After locating the residence, Gatrell parked nearby and waited for backup to arrive. While he was waiting, Gatrell searched for further information about Avalos using the West Valley police database and discovered that Avalos had been arrested the year before for possession of a controlled substance with intent to distribute. A few minutes later, Sergeant Jeffrey Conger arrived, and the mother let them in the house. Inside, she led the officers to the family kitchen area and briefly explained the situation. She explained that she had seen Avalos rummaging through Herrera's purse earlier that morning and that he had looked at her in a threatening way and told her to mind her own business. She also told the officers that Avalos sold drugs, had a gun, and that he had previously threatened Herrera by pointing a gun at her head just two weeks before.

The mother then escorted the officers downstairs to a bedroom occupied by Herrera and Avalos. Out of concern for the mother's safety, the officers asked her to stay upstairs. The officers were concerned that Avalos might have a gun, and, accordingly, did not announce their presence as they entered the basement. As Officer Gatrell explained, "[i]f they didn't know we were there, there is less time for him to prepare if he had a handgun, to consider using it against us." (Tr. at 19.)

Downstairs, the officers found the daughter, Herrera, walking out of a bathroom. Surprised to see the officers, Herrera "told her mother that everything was okay and there was no need for [the officers] to be there." (Id.) The mother's presence downstairs, despite their request that she remain upstairs, concerned the officers. As Officer Gatrell explained, "[i]f there had

2

been a confrontation downstairs there would have been another person to try to keep track of. It would make it more difficult to control the situation." (Tr. at 20.) Herrera then told the officers that Avalos was in the bedroom and motioned toward a closed door across the hall. Conger knocked on the bedroom door, but Avalos did not respond. Gatrell announced that it was the West Valley City Police Department. Five to ten seconds after knocking, Conger checked the door handle. Seeing that it was unlocked, he opened the door but was unable to open it fully because Avalos was standing behind it. The officers immediately ordered Avalos to show his hands, but he only showed his left hand and not his right.

After a few moments, the officers entered the bedroom and placed Avalos in handcuffs. He was not read his Miranda Rights but was told that he was being detained. Gatrell then separated the parties by taking Avalos upstairs and outside of the house to sit on the front porch where he asked Avalos about his relationship with Herrera "to establish[] the criteria for domestic violence under Utah state law." (Id. at 26-27.) From this conversation, the officers also learned that Avalos had previously been convicted of the felony offense of aggravated assault. A few minutes later, Conger joined them and Gatrell went back inside to talk to Herrera. While speaking with Herrera, Gatrell learned more about the incident where Avalos had pointed a gun at her. She "reported that [Avalos] had come home after not being home, and she had looked through the bedroom prior to him coming home and noticed some things had been moved out of place, and he became upset and proceeded to load the firearm and point it at her head." (Id. at 30.) Avalos also told her "[t]hat he didn't want to lose her, and that he would kill her and then kill himself." (Id.) When Herrera seemed reluctant to continue talking, Gatrell asked whether she would prefer to return to the basement. After the two returned to the downstairs bedroom, Herrera, without prompting, opened a bag on the bed and pointed to a black handgun.

During this time, Officer Stuart Palmer arrived. He was observing Avalos, who was handcuffed and sitting on the front steps. At one point, Avalos stood up, stretched his cuffed hands to his right pocket, pulled out a .32 caliber handgun, and tossed it toward a nearby bush. The gun bounced off the bush and landed on the grass. Seeing this, Palmer notified the others via his radio and Avalos was arrested, Mirandized, and searched. The officers found methamphetamine, an oxycodone tablet, and approximately $2,700 in cash in his pockets.

After Avalos had been placed in the back of a police car, Palmer asked for Herrera's consent to search the home for drugs and guns. Herrera testified at the hearing that Palmer threatened to contact the Department of Children and Family Services ("DCFS") if she did not sign the form. Conversely, Palmer testified that he did not mention DCFS, but only that the search would be good for the safety of the children. He testified that she "was very upset. She was very scared. Initially she said she didn't want to [give consent] because she was afraid that [Avalos] would come back and kill her." (Tr. at 62.) Palmer "explained to her . . . [that] it would be best for [the officers] to go and get [the guns and drugs] for the safety of the children. [The officers did not] want her kids getting ahold of guns or drugs." (Id. at 62, 71-72.) During this conversation, Palmer amended the consent form with a handwritten note describing the purpose of the search as being for the safety of the children in the home. Herrera "thought that [removing the guns and drugs] would be a good idea" and "[s]he signed the consent form." (Id. at 62, 70.)

The court finds Palmer's version of the conversation to be more credible and finds that Palmer did not mention DCFS.

After Herrera signed the consent form, the officers searched the downstairs bedroom and found a 9 mm handgun, a high-capacity magazine, methamphetamine, and other drug paraphernalia.

**CONCLUSIONS OF LAW**

Based on the foregoing findings of fact, and the law as presented by the parties, the court now enters the following conclusions of law.

Defendant contends that his initial detention was unlawful because the facts of this case do not qualify under the exigency exception to the warrant requirement. Additionally, he claims that Herrera's consent to search was not valid. As discussed below, the court concludes (1) that the officers' initial warrantless entry was justified by exigent circumstances based on the domestic violence call,[1] and (2) that Herrera's consent to search was voluntary and valid.

1.  **Exigent Circumstances**

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "Subject to limited exceptions, the Fourth Amendment prohibits warrantless searches of an individual's home or possessions." United States v. Andrus, 483 F.3d 711, 716 decision clarified on denial of reh'g, 499 F.3d 1162 (10th Cir. 2007) (citing Illinois v. Rodriguez, 497 U.S. 177 (1990)).

The exigency exception applies when circumstances pose a significant risk to the safety of a police officer or a third party. United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006). The test for exigent circumstances "is now two-fold, whether (1) the officers have an objectively

---

[1] Although not necessary for the court's conclusion, Defendant concedes that the mother had both actual and apparent authority to grant the officers initial entry into the home. (Def.'s Reply Memo, 3.)

5

reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." Id. at 718.

First, the court must "evaluate whether the officers were confronted with reasonable grounds to believe there was an immediate need 'guided by the realities of the situation presented by the record' from the viewpoint of 'prudent, cautious, and trained officers.'" Id. at 718-19.

In this case, the officers reasonably believed there was an immediate need based on several facts: the mother told police dispatch that a verbal and physical domestic confrontation was happening and that Avalos carried a gun. The mother also told dispatch that there were children in the house. While waiting for backup to arrive, Gatrell determined that Avalos had been arrested for dealing drugs. Later, inside the house, the mother repeated what she had told dispatch and also explained that Avalos had previously pointed a gun at Herrera's head. Once downstairs, the officers were concerned because the mother had joined them, despite their request. Had there been a confrontation, the officers worried that "there would have been another person to try to keep track of" making it "more difficult to control the situation." (Tr. at 20.) Furthermore, the officers did not see the children or know for sure that they were out of harm's way. Adding to their concern, Avalos was behind a closed door and did not respond when the officers knocked and announced their presence. When one of the officers opened the door, Avalos only showed his left hand. Under these circumstances, the officers were justified in temporarily detaining and removing Avalos from the basement for their safety and the safety of the other people in the house.

Next, the manner and scope of a search must be reasonable based on the exigencies that motivated the search. United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006). Here, the

officers correctly limited the manner and scope of their search to only what was reasonable to locate Avalos and prevent any escalation of the domestic confrontation.

### 2. Valid Consent

"Consent is valid, if voluntarily provided, and is not the product of duress or coercion, either express or implied." United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992). Furthermore, "contradictory testimony requires the trial court to make a credibility determination." Id. at 563.

Defendant contends that Herrera's written consent to search the house was invalid because the officers threatened to call DCFS if she did not sign. Because the court has found that the officers did not mention DCFS, the court concludes that the officers did not threaten Herrera. Thus, Herrera's consent was voluntary and valid.

## CONCLUSION

Given the information provided to the officers by the mother and by dispatch, combined with the unknown extent of the existing confrontation and Avalos's apparent evasion, the officers had an objectively reasonable basis to detain Avalos based on an immediate need to protect the lives and safety of themselves and the others in the house. Additionally, the court finds that the officers did not mention DCFS in a threatening manner and Herrera's consent was voluntary. Accordingly, Defendant's motion to suppress is DENIED.

DATED this 4th day of June, 2014.

_____
Dee Benson
United States District Judge